| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS |
|---|---|

UNITED STATES OF AMERICA, §
§
        Plaintiff, §
§
*versus* §    CRIMINAL CASE H-04-126-1
§
JOHN ANTHONY CLARO, *et al.*, §
§
        Defendant. §

# Opinion on Defense Fees and Expenses

1.    *Introduction.*

The United States Attorney indicted an Oklahoma businessman in conscious indifference to the legal and factual basis of the charges that they brought against him. The fifty-four-count indictment was a jumble of claims and stray facts – a garbled press release about working men who cannot get insurance. The court dismissed all counts of the indictment. The businessman seeks defense costs. He will be repaid because the prosecution was not substantially justified.

2.    *Background.*

On March 25, 2004, John Claro and seven others were charged with conspiracy, mail fraud, and money laundering in an indictment accompanied by a press release. The government accused Claro, Jack Ferguson, Milton Wilkinson, Gary Hoskie, James Glidewell, Brian Glidewell, Michael Reeve, and Euan McNicoll of conspiring to mislead businesses about services they offered in connection with companies funding their own health insurance.

It said that they "induced" plan users to pay low premiums by falsely claiming that they were not subject to state regulation. It accused them of diverting some premium funds into bank accounts of fictional offshore entities instead of paying the legitimate insurers. It said that they knew that their other re-insurers were undercapitalized and would not pay the claims filed.

Claro was arrested by FBI agents, and he hired John Neville to defend him. He pleaded not guilty and was released on bond. On Claro's motion, the court dismissed the indictment without prejudice on July 20, 2005. The government failed to appeal the

dismissal or reindict him, and Claro moved for defense costs under the Hyde Amendment.

3.  *Hyde Amendment.*

To recover attorney's fees and expenses from the United States under the Hyde Amendment, the party must succeed in his defense and show that the government lacked substantial justification for the prosecution. Pub. L. 105-119, Title VI, § 617, 111 Stat. 2519 (1997), reprinted in 18 U.S.C. § 3006A, Historical and Statutory Notes. The prosecution is unjustified when it shows either intentional or reckless disregard of the known facts and rationally inferred law. *See, e.g., United States v. Reyes*, 16 F.Supp.2d 759, 761 (S.D. Tex. 1998). Ignorance and ineptness may produce a prosecution that lacks substantial justice.

4.  *Unreasonable Prosecution.*

Claro defended himself for nearly sixteen months from fifty-four counts derived from shifting legal theories and inaccurate representations of the facts. The dismissal of the indictment was based on its contents and the government's behavior during the prosecution. By even a moderate sense of the rule of law, the charges were an amalgam of vague implications about insurance regulation, fraud, and unhappy employees – a giant amoeba.

The government's stubborn insistence on finding wrongdoing after it indicted Claro prolonged a groundless action that had little prospect of success. The prosecution was unreasonable and showed at least a reckless disregard for the truth.

   A.  *Grand Jury.*

The government misled the grand jury by spinning an emotional tale of the application of insurance regulation even though none of the fifty-four counts dealt with a violation of insurance regulations. Not only was it irrelevant, it tainted the presentation.

The government had evidence of $13 million in health care claims that went unpaid after Heartland's clients contributed over $45 million in premium payments. It said that Claro helped incorporate and find insurers knowing that they would not pay the claims, but it had no evidence to support the allegation. Claro was prosecuted for a generalized result instead of his particular actions.

B.  *Indictment.*

The indictment began with a multi-page, inaccurate introduction to insurance regulation in the United States. By its tone, it seems to indicate that having a self-funded plan reinsure itself is somehow illegal.

Count one charged conspiracy to commit mail fraud in connection with a healthcare benefit program, money laundering, and monetary transactions with funds derived from criminal acts. Counts two to six charged mail fraud connected with health benefit programs. Counts seven to thirty-seven charged discrete acts of monetary transactions with criminally derived property. Counts thirty-eight to fifty-four charged specific instances of money laundering.

C.  *No Evidence.*

On April 12, 2004, the government gave Claro a list of 1,591 exhibits and made its evidence room available to them. The list included evidence for all eight defendants. Four months later, it told him that it would only use ninety-eight exhibits, but it did not identify which ones.

On October 7, 2004, Claro requested the government to explain how he committed the charged crimes. The government told the court that it was fully disclosing its information, and the court denied Claro's request. Claro then complained that the government continued to withhold evidence.

The government argued that it had made its evidence available to Claro, who had already gone through 200 of the 500 total boxes of documents. It said that he only thought that he had seen the trial exhibits and grand jury testimony because they were on the master exhibit list that it gave him. It said that it was too early for him to see its actual trial exhibits because they had not yet prepared them for the trial that was scheduled for three and a half months later – and it would give him *Jencks* material after it selected its trial witnesses, according to local custom.

The court told the government to give Claro the reports of its prosecutorial agents that formed the factual basis of the charges and to return all removed documents to the evidence room. It also instructed it to prepare its trial memorandum within six weeks.

The government gave Claro a new exhibit list with over 500 more exhibits. November 4, 2004 – seven months after the indictment – the government's evidence of Claro's offenses remained muddled. The government explained that it would use financial statements of the re-insurers to show that Claro knew that they were undercapitalized; Claro's depositions from another proceeding; and "other evidence." It had not yet identified the "other evidence" because it said that it wanted to "focus" it

- 3 -

before Claro got it. The court again cautioned the government and told it to give him the evidence related to the selection of the re-insurance companies and illegal arrangements between the defendants and the reinsurance companies

In its trial memorandum from December 2004, the government included seventeen additional exhibits. It accused Claro of creating a new third-party administrator with his secretary and her husband. It claimed that Ferguson changed the name of Heartland to avoid regulators.

Claro again moved for a bill of particulars in January 11, 2005. Alternatively, he asked that the indictment be dismissed. He said that the government had yet to explain his participation in the conspiracy and the other charges. The other defendants adopted his motion. The government argued that Claro was charged as part of a chain conspiracy and shared the acts of the other conspirators.

On July 19, 2005 – more than sixteen months after the indictment – the government had yet to explain its charges against Claro. It still could not quantify the $13 million in unpaid claims. It aggregated each claim that was unpaid, attributing to two re-insurers the same $4 million of unpaid claims that one re-insurer assigned to another, resulting in $8 million value for $4 million in actual claims. Premium payments and unpaid claims are not evidence of fraud. Not every claim made to an insurance company merits payment. Some people who pay a premium collect nothing and others collect a lot more than they pay. Even with the data on claims paid, the raw figures tell you nothing about a scheme to do anything. The government had data without any context.

The government failed to give Claro *Brady* material. It says even now that he is clearly in possession of the material that he says is missing, whether from the government or his own records.

The government also flatly ignored orders to turn over documents from related civil and criminal cases. In another criminal case, the government alleged that one of Claro's clients was a victim of the charged fraud. In Claro's case, it alleged that the same client perpetrated fraud.

The government admitted that it removed most of the documents from the related criminal matter; it said that they were irrelevant or privileged, but it gave Claro no privilege log. Even after the court ordered the government to give him the documents, it returned only one of six boxes of evidence.

6. *Fees and Expenses.*

    A. *Base Fee.*

The Hyde Amendment incorporates the procedures of the Equal Access to Justice Act to award fees and other litigation expenses. *United States v. Peterson*, 71 F. Supp. 2d 695, 698 (S.D. Tex. 1999). The Act authorizes reimbursement for fees and costs up to $125 per hour. The $125 rate was established in 1996, and it must be adjusted to its equivalent value in 2004 to 2006 when Claro incurred his legal costs.

The consumer price index for all urban consumers in the Houston, Galveston, and Brazoria area of Texas is used to calculated the cost of living adjustments. The adjustment is made by multiplying $125 by the index for the year that the expenses were incurred and dividing the product by the index for 1996. The result is $159 for 2004 and $172 for 2006. The reasonableness of the fees requested by Claro are evaluated by a benchmark of $159 to $172.

    B. *Hartzog Conger Cason & Neville.*

Claro requests $332,606.29 for his obligation to the firm of Hartzog Conger Cason & Neville. Neville charged $250 per hour for 554.9 hours, plus $3,500 for the Hyde hearing – $144,225. William Johnson worked 297.9 hours at $225 per hour – $67,027. Russell Cook worked 307.65 hours at $220 per hour – $67,683. Lincoln McElroy worked 62.8 hours at $130 per hour – $8,164.

In addition to the attorneys there, Claro paid the firm for the work of two paralegals – $13,057; law students – $1,007; and research and copying expenses – $33,442.29. His total bill was $332,606.29 for 1,221 hours of work.

The base fee was designed for paying panel attorneys for repetitive appointments to routine criminal cases; it was not designed as the maximum compensation for sophisticated, experienced trial lawyers in a fifty-four-count conspiracy case that covered ten years of several businesses. Neville vigorously pursued a long, impenetrable indictment that the government insisted was supported beyond a reasonable doubt by a couple of million documents and at least dozens of witnesses. He had to prove there was no case document by document.

Under the Hyde Amendment, a higher award of fees may be made when the demands of the circumstances warrant it. Given the complexity of the facts and the abstract, ethereal nature of the government's application of the law, it was impossible to handle Claro's case at a statistically normal criminal defense rate. The calculation of the amount of money that the government owes Claro for the services of Drew Neville in

excess of the base fee is made under the guidance of the usual factors. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1972)

The time and labor required for this case is a neutral factor because he charged Claro an hourly rate. The government's expert claimed that Neville's hours are excessive, but he was unfamiliar with the government's conduct in the case. A normal criminal action might have taken less time, but this was not a routine criminal defense.

The novelty and difficulty of the case is a neutral factor because Claro faced established charges, even though they were complicated by insurance regulation issues. The fee quoted to Claro is also a neutral factor; there is no evidence that Neville's firm faced a significant credit risk when it accepted Claro's case. Neville also faced no social risk for accepting the case, and the undesirability of the case is a neutral factor.

The nature and length of relationship between Neville and Claro is slightly positive. They have known each other for a long time, and Neville probably undertook the case with more zeal because of it.

The skill required is a significant factor. In twenty-one years, this would have been the most extensive conspiracy case before the court. It was a verbal case requiring more time and skill than a physical case. Neville had to sort through millions of documents on the government's promise that there was a crime in them somewhere.

The rest of the positive factors overlap with the consideration of the customary rate for similar work in the community. The case required a capable, distinguished lawyer cogently to focus the mass of accusations and the universe of trivia; Neville did. He has thirty-five years of litigation experience and is rated AV. The results and awards in similar cases are also subsumed by the customary fee consideration.

Neville's peers would have charged at least $ 400,000 for 900 hours of work. Patrick Ryan contacted Claro six days after he was indicted and offered to defend him for $600,000. Richard Haynes would have billed about $ 590,000 to defend him. Dan Cogdell would have charged $350,000. Even the government's expert for attorney's fees was paid a rate of $ 650 per hour – at 900 hours he would have charged him about $400,000. Neville's fee of $ 332,606.29 is very reasonable when compared to the customary rate.

Claro also requests $28,000 for Neville's pursuit of his Hyde Amendment claim. Under the base fee and the factors, it is a reasonable amount.

C.   *Cruse Scott Henderson.*

Claro incurred $1,686.42 at Cruse Scott Henderson. He employed John Vogel as local counsel for Neville at $200 per hour for 5.2 hours – $ 1,040. Cruse Scott

Henderson's paralegal fees and expenses in support of Vogel were $646.42. Vogel is highly competent, and his knowledge of the transactions involved that he gained from acting as counsel for Heartland in a previous civil case made him helpful beyond his billing rate.

    D.    *Dick DeGuerin.*

Claros' request for $249,481.29 – a contingency fee for forty percent of the total fees requested by all of Claro's counsel – for the assistance of Dick DeGuerin with his Hyde petiton is denied. It is unreasonable. DeGuerin did no work. DeGuerin was unable at hearings to answer simple questions about the case. Claro and Neville's firm did, aided by an exceptional paralegal.

    E.    *John and Janis Claro.*

John Claro requests $ 76,250 – $250 per hour for 305 hours for his legal work; $183,750 for the work of his wife, a paralegal – $75 per hour for 2,450 hours; and $32,910 for their expenses. He asks for $292,910.53 for himself and his wife as costs "incurred" as allowed by the Equal Access to Justice Act.

The government insists that the fees itemized by Claro's legal work and the paralegal services of his wife, Janis, were not "incurred" as described by the Equal Access to Justice Act. It argues that he should be denied reimbursement for his efforts in his own defense as if he were a pro se litigant. Claro alternatively asks for the $292,910.53 as an expense if the court does not find that he "incurred" it.

Neville's fee is much lower because he had the assistance of a bright, energetic client – a lawyer skilled in the kind of transactions underlying the case. Janis Claro provided the kinds of help every husband would want, and she is someone every lawyer would want to have helping him help his client.

As direct, interested parties, their fees are not compensable. *See Kay v. Ehrler*, 499 U.S. 432, 437 (1991). An attorney who represents himself has "incurred" no expense for fees that is payable under the Hyde Amendment and the Equal Access to Justice Act. Just as a defendant who is not a lawyer is not reimbursed by the government for assisting in his defense and the opportunity costs of defending himself, a defendant who is a lawyer is not either, even if he uses his legal skills.

$29,000 of the Claros' direct expenses for items such as copying, filing, air fare for Neville, and transcripts is compensable. This reflects a reduction to exclude expenses that may have directly benefitted the Claros.

7. *Conclusion.*

Criminal prosecution casts a shadow on defendants that can linger even after an acquittal. The discretion the government has to prosecute those it thinks guilty of crimes must be grounded in a sound facts and articulated law. The Hyde Amendment was passed to give some recompense to those prosecuted without this most basic discretionary safeguard from prosecutorial oppression. The case against Anthony Claro lacked even a semblance of responsible work by the government. His attorneys had to work with a jumbled array of facts and theories, a mountain of documentary evidence, and unresponsive government lawyers.

The government must reimburse Claro $391,292.29 in attorney's fees and related expenses. This is a lot of money, and it will be paid from the taxpayers' hard-earned funds.

Some would characterize this as a raid on the treasury. The government can prevent these raids by choosing to be responsible – stopping their own raid of wasting the resources entrusted them for careful, reasonable expenditure in sound pursuit of the legitimate public interest. The misbehavior of the prosecutors costs the taxpayers twice; once in the consumption of their salaries and other expenses in not doing their job, and once in restoring the person whom they injured. "Protecting" the treasury only defends governmental excess – not the public.

Signed July 31, 2007, at Houston, Texas.

_____
Lynn N. Hughes   USDJ
United States District Judge